**MIDLAND GLASS COMPANY, Inc.**

v.

**Edward V. SMITH, individually, and as President, et al.**

**Civ. A. No. 460–71.**

United States District Court,
D. New Jersey.

April 26, 1971.

Herbert Burstein, Herbert New Brenner, New & Brenner, Jersey City, N. J., for plaintiff.

Marvin M. Wodlinger, Millville, N. J., for defendants.

BARLOW, District Judge.

The plaintiff, Midland Glass Company, Inc. (Company), brings this action to prohibit the defendants, Edward V. Smith, individually and as President, and C. O. Middleton, individually and as Secretary of the Glass Bottle Blowers Association of the United States and Canada, AFL–CIO (Local 119), from striking on or about April 1st, 1971. The Glass Bottle Blowers Association of the United States and Canada (GBBA), which is not a party here, is the International Union which represents Local 119 as one of its constitutents. Both parties agree that this court may resolve whether or not there exists between the Company and the defendants, Local 119, a specific collective bargaining contract.

The Company has three plants for the production of glass containers at various points in the United States—one at Clifton, New Jersey; one at Terre Haute, Indiana, and one at Shakopee, Minnesota.

On or about October, 1970, Midland Glass did have a labor agreement with Local 119. This contract was effective April 1st, 1968, to April 1st, 1971. At some time on or about August, 1970, the Company did receive a communication from GBBA, in connection with the labor agreement, asking, in substance, that negotiations begin with the largest company in September, 1970.[1] On September 11th, 1970, the plaintiff wrote back to a Mr. Lee W. Minton, International President, Glass Bottle Blowers Association of the United States and Canada, advising him that they were prepared to meet at all reasonable times and places for the purposes of negotiating a reasonable bargaining agreement.[2]

As a result, a meeting was held in Pittsburgh, Pennsylvania, in the latter part of October or November, 1970.

At that meeting, representing the Company, were Duncan Morrison; A. E. Resnick; Paul Arvidson; Larry Cochrane; Frank Reid; William Ware;

---

1. Plaintiff's Exhibit, P–2, in evidence.

2. Plaintiff's Exhibit, P–3, in evidence.

James J. Dill; O. Davis; R. Stroup, and D. Spurling. Counsel for the Company, Herbert Burstein, was also present. For GBBA, Harry Moore, International representative, was present, as were conferees from Local 119, including the defendants Edward V. Smith and C. O. Middleton.[3]

The Company announced that it had a right to negotiate a contract there. Mr. Harry Moore, the International representative, requested a recess or a caucus, after which Mr. Moore said that a problem had developed about the matter of authority which would have to be referred to the International for resolution. Mr. Burstein then advised that: "We certainly can't negotiate with a group of conferees who do not have authority to negotiate, and until the GBBA reaffirms the authority of their conferees to negotiate a contract, there is no point in continuing the discussion, and when we do get this word from GBBA with respect to the authority to negotiate, we will be glad to reconvene." The meeting in Pittsburgh then recessed.

On November 15th, as a result of telephone calls from the Union, the meetings were reinstituted in Chicago, Illinois. Essentially these same persons who attended the meeting in Pittsburgh were present. Amongst all other persons there were the defendants Edward V. Smith and C. O. Middleton. These defendants took part in the negotiations until such time as November 25th, 1970. The Company needed further time to reassess the demands of the Union and, as a consequence, asked for, and were given, a recess.

On December 4th, the negotiations were resumed in New York City. On December 4th, through and including December 10th, 1970, most of the same persons were present; Mr. Smith was present, as was Mr. Moore, and for GBBA there was also present an additional person, Mr. Francis Heston. Finally, on December 10th, 1970, the GBBA had given to the Company what the GBBA described as its "final proposal", as the "proposal we would have to meet to come up with the contract". That proposal was submitted in the presence of the defendants Smith and Middleton and the other conferees. The Company took the contract and caucussed. They came back into the room thereafter and Mr. Robert Ganter, a Company representative, said: "And if we agree to that proposal we will have a contract?"; and Mr. Moore said: "Yes".

Mr. Moore looked around the table to the various conferees. Mr. Smith and Mr. Middleton were there, and they gave no indication that they were opposed to the contract. Mr. Ganter then said: "Well, we have an agreement. If you sign this signature sheet of the agreement, we have a contract." Mr. Ganter signed the signature sheet, handed it to Mr. Moore and to Mr. Heston, of GBBA, both of whom also signed the signature sheet. Thereafter, the Terre Haute and Shakopee Locals came up and said: "We want to sign it, too." Neither Mr. Smith nor Mr. Middleton came to the table to sign the signature sheet.

It is Local 119's position that prior to the commencement of the negotiations in Pittsburgh the Company knew that Local 119 insisted upon ratifying any agreement reached before that agreement became a contract. Mr. Smith testified that after the negotiations were terminated in Pittsburgh Mr. Burstein told the defendants that the plaintiffs were negotiating with the International Union and that he notified Local 119 that they had no right to ratify any contract reached in terms of the Constitution of the GBBA; that, in any event, they adjourn until Local 119 and GBBA worked out its problems. Mr. Smith further testified that even prior to the Pittsburgh meeting he had talked to a Mr. Arvidson and, as well, to a Mr. Artie Resnik, both Company representatives. On both of those occasions he had told those

3. There were other people present at the conference, representing Local 132, Terre Haute, and Local 129, Shakopee.

gentlemen that Local 119 insisted upon its right to ratify any contract reached as a result of the negotiations. Furthermore, Mr. Smith testified that either on the fourth or fifth day of October, 1970 —prior to the negotiations at Pittsburgh —Mr. Moore, the International representative of GBBA, appeared at a meeting of Local 119 and stated to Local 119 that there would be no contract until the two conferees from Local 119 signed the same. Further, Mr. Smith insisted that after the contract was signed, following the conclusion of negotiations in New York, Mr. Ganter asked him if Local 119 would sign the contract. He was told no; that it had to be taken back for ratification; further, that he then prepared a memo, which is not in evidence, which he gave to Mr. Ganter to be sent back to the Company, presumably setting forth the broad details of the contract. Mr. Smith also indicated that he had talked to Mr. Gill, another Company representative, at that same time and advised him of that same fact.

On December 16th, Mr. Smith testified that he prepared a letter to the Company, as well as to Mr. Lee W. Minton, International President of GBBA, and a copy of that same letter, as well, to Mr. Moore.[4] That letter, in sum, indicated that Local 119 still insisted on its right to ratify the contract and, that not being done, considered that no contract was currently available, and that if no contract was available by April 1st, 1971, then Local 119 would strike. The letter also indicated that the Company was paying the members of Local 119 the raises set forth in that new contract, and, although it did not indicate that it would return these moneys, it did indicate that the acceptance of those payments did not, in their view, constitute a contract. Mr. Smith agreed that he had not sent any money back to the Company.

Certain other documents were admitted. One of these documents was a telegram dated October 27th, 1970, which was the last day of the Pittsburgh meeting.[5] The telegram was sent by Lee W. Minton, International President, GBBA, directed to C. O. Middleton, "instructing you to rescind action of tying conferees hands" and indicating that every moment's delay was costing the members of the Union "a lot of money". On that same day, the defendants introduced a letter from Harry Moore to C. O. Middleton, indicating that in 1968 GBBA had agreed to the ratification by the membership of the Locals involved for that time only, with the understanding that it was a one-time-only change from the Constitution.[6] On October 28th, a telegram from John C. Sutton, who was then the outgoing President of Local 119, although not a conferee in Pittsburgh, was sent to Mr. Minton indicating that "No action to tie conferees hands has been taken. Suggest you reconvene conference immediately. Every moment's delay costs each member a lot of money".[7] On November 2nd, 1970, Mr. Minton again sent a telegram to Mr. Middleton, indicating that Mr. Sutton had told him that the conferees' hands were not tied, and indicating, further, that his office "will not be responsible for delay affecting membership's welfare. I am holding each of you responsible. Am instructing you to assume your responsibilities in accordance with our Constitution".[8]

On December 18th, Mr. Minton again wrote, this time to Mr. Smith, indicating that he was "to notify all members of 119 that a contract had been negotiated, accepted and in effect. No voting through use of mass meetings is in accord with conference results. Anyone attempting to utilize meetings for purpose of violating Constitution is not adhering to Con-

4. Defendants' Exhibit, D-3, in evidence.

5. Plaintiff's Exhibit, P-11, in evidence.

6. Defendants' Exhibit, D-2, in evidence. Mr. Moore, who was at the meeting in

Pittsburgh, apparently addressed that letter from Pittsburgh.

7. Plaintiff's Exhibit, P-12, in evidence.

8. Defendants' Exhibit, D-6, in evidence.

stitution".[9] Finally, on January 7th, 1971, Mr. Minton wrote a letter to all of the members of Local Union 119, indicating to them the fact that a contract had been negotiated and that it was a "legal and effective contract and responsible Union leadership and membership must abide by the agreed-upon conditions and terms".[10]

The argument here is, as we have noted, was there a contract between GBBA and Local 119 which permitted GBBA to negotiate for a collective bargaining agreement? Clearly, it is not required here to determine the facts, because even if the facts are as Local 119 suggests they are, they still cannot change the fact that they were represented by GBBA and GBBA was authorized to negotiate a contract.

The prior contract, which expired on March 31st, 1971, in Article I, Section 1, states as follows:

"The Company recognizes the Union as the sole collective bargaining agent for apprentice machine operators, machine operators, machine upkeep men and machine repair men and all other hourly-rated employees who devote their full time to the repair and maintenance of forming machines, and for all production and maintenance employees of all departments except those employees engaged in supervisory, professional, technical, administrative, office, clerical, guard, and management work, and those employees covered by contracts with other unions."

It is the view of Local 119 that by telling management and, as well, GBBA —however informally—that it insisted upon the right of ratification of any negotiated contract, that management was thereby advised that GBBA no longer represented the defendants. This view is, of course, entirely inconsistent with the negotiations which were undertaken in Pittsburgh and continued through Chicago and, finally, until December 10th, 1970, in New York, when the nego-

tiations were completed. The evidence clearly discloses that the defendants— Edward V. Smith and C. O. Middleton— took part in those negotiations and, again, at the end of the negotiations, insisted upon their right to ratify the contract resulting therefrom.

Furthermore, even assuming Mr. Moore, the International representative who negotiated the contract, did advise Local 119 that no contract would occur until Local 119 ratified it is of no moment. For nowhere in the proofs did the defendants establish that Mr. Moore had any right to modify GBBA's Constitution, and this is particularly so in view of the evidence that Mr. Minton, the International President of GBBA, had continually directed Local 119 and its representatives to stop tying the conferees hands and to permit the bargaining to go forward.

Whether or not the Company was aware of this dispute between the GBBA and Local 119 is beside the point. The Company had a right to negotiate with the established bargaining agent until such time as that bargaining agent was replaced by another. The National Labor Relations Board has acknowledged the rights of parties engaged in multi-party negotiations to withdraw from bargaining sessions to bargain with a single employer or a single union on behalf of a single unit of employees. However, certain guidelines have been enunciated by the National Labor Relations Board relating to a proper withdrawal from collective bargaining in such circumstances.

In Retail Associates, Inc., and Locals Nos. 128 and 633, Retail Clerks International Association, AFL–CIO (1958) [120 NLRB, 388], the Board states:

"We would accordingly refuse to permit the withdrawal of an employer or a union from a duly established multi-employer bargaining unit, except upon adequate written notice given prior to the date set by the contract

---

9. Plaintiff's Exhibit, P–8, in evidence.

10. Plaintiff's Exhibit, P–9, in evidence.

92

for modification, or to the agreed upon date to begin the multi-employer negotiations. Where actual bargaining negotiations based on the existing multi-employer unit have begun, we would not permit, except on mutual consent, an abandonment of the unit upon which each side has committed itself to the other, absent unusual circumstances."

Here, there is no evidence that the Local, even assuming it did make its views clear to management and to GBBA, ever disposed of GBBA as its negotiating agent. Certainly there was no adequate written notice given prior to the date set by the contract for modification, and, indeed, there is no such writing today.

What Local 119 has attempted to do, really, is to modify their agreement with GBBA to permit them to qualify GBBA's representation of them by insisting upon ratifying any contract which GBBA negotiates for them. While this could be done, it would have to be done within the Constitution of GBBA. Section 3 of that Constitution provides: " * * * all conferences shall be under the direction of the International President and International Executive Board * * * ". Testimony at the trial satisfies this court that the word "conferences" means a collective bargaining negotiation such as is involved here. Having failed to accomplish that, it would seem that Local 119 may withdraw from GBBA by following the proper procedures therefor[11] or, in the alternative, arrange with GBBA for the ratification of contracts to be negotiated in the future.

It is clear, therefore, that GBBA, then the collective bargaining representative of Local 119, negotiated a contract with the Company, and that that contract now controls the relationship between the Company and Local 119.

An appropriate Order will be submitted.

11. See 29 U.S.C. § 159 for the method of replacing either a designated or selected collective bargaining representative.